UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                    **REPORT & RECOMMENDATION**
                                                    **21 CR 571 (BMC)(LB)**

          -against-

PERCELL ROSS,

                         Defendant.
---------------------------------------------------------------X
**BLOOM, United States Magistrate Judge:**

Defendant Percell Ross ("Ross" or "defendant") is charged with violating the felon-in-possession statute, 18 U.S.C. § 922(g). Ross moves to suppress the firearm recovered from the scene of his arrest and his post-arrest statements to law enforcement. ECF Nos. 10, 19. The Honorable Brian Cogan referred defendant's motion to me for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). After an evidentiary hearing and for the reasons set forth below, it is respectfully recommended that defendant's suppression motion should be denied.

## FINDINGS OF FACT

The Court held an evidentiary hearing and the parties filed post-hearing briefs. ECF Nos. 37-39. At the hearing, the government called two witnesses: New Rochelle Police Department ("NRPD") Detective Matthew Velasco ("Velasco") and Federal Bureau of Investigation ("FBI") Special Agent Arthur Sacco ("Sacco"). The following summarizes the relevant facts based on the witnesses' sworn testimony and the exhibits received in evidence.

*I.        Ross's arrest*

Velasco credibly testified that in October 2021, as an officer with the New Rochelle Police Department,[1] he was part of a law enforcement team tasked with finding and arresting

---
[1] Velasco was subsequently promoted to detective in 2023. Transcript 5, 4-8.

Ross, a suspect in a homicide committed with a firearm in New Rochelle, New York on October 14, 2021. Transcript ("Tr.") 5, 23-25; 6, 10-16; 8, 1-2; 41, 15-17; 61, 8-10. Law enforcement identified Ross through license plate readers and city camera surveillance video that captured the suspect, before and after the homicide, getting into a vehicle registered to Ross: a Dodge Caliber with license plate number UBV 3726 (the "Dodge Caliber"). Tr. 7, 5-25; 12-13, 19-2. Velasco reviewed this surveillance footage and saw Ross and the Dodge Caliber. Tr. 7, 17-25. NRPD Detective Adrian, the case detective, also informed Velasco that Ross had arrest warrants from Connecticut and Virginia. Tr. 46, 2-9. Velasco did not personally review the Connecticut or Virginia warrants, or the National Crime Information Center ("NCIC") database report that listed these out-of-state arrest warrants. Tr. 46, 7-15; 47, 22-24. No warrant was issued for Ross's arrest based on the New Rochelle homicide. Tr. 44, 8-12. There was no wanted poster depicting Ross, photo array, or lineup identification. Tr. 44, 2-7.

On October 16, 2021, Velasco reviewed surveillance video of the Dodge Caliber at the Ingersoll Houses in Brooklyn, New York and of Ross entering a building "shortly after" the homicide. Tr. 9-10, 19-1.

In the early morning on October 17, 2021, a New York Police Department mobile license plate reader picked up the Dodge Caliber in the vicinity of the Ingersoll Houses. Tr. 9, 1-12.  On that date, Velasco arrived at the Ingersoll Houses between 7:00 and 8:00 a.m. Tr. 10, 2-4. Velasco and his partner from the NRPD, Detective Rodriguez, drove a "soft car": an unmarked, non-standard-issue police vehicle used to avoid detection. Tr. 14, 17-18; 50, 1-25. Velasco and Rodriguez wore plain clothes and a jacket with "police" in white lettering on the back. Tr. 14-15, 19-18. Other law enforcement officers were stationed around the Ingersoll Houses, including Detectives Adrian, Herring, and Fagan from the NRPD, as well as Officers Messina, McGloin

2

and Correale also from the NRPD. Tr. 51-52, 1-17. These officers were joined by FBI agents who were part of a joint NRPD-FBI taskforce. Tr. 15, 19-25; 51, 13-18.

Velasco testified that when he arrived that morning, he saw the Dodge Caliber parked on the outskirts of the Ingersoll Houses. Tr. 10, 7-10. On cross-examination, however, Velasco testified that another NRPD detective, Detective Messina, was the first member of the team to identify the Dodge Caliber parked outside of the Ingersoll Houses. Tr. 54, 10-16. Detective Messina transmitted over the radio that he observed the Dodge Caliber unoccupied. Tr. 55, 12-18. In response, Velasco drove closer to where the Dodge Caliber was parked to surveil it. Tr. 56, 14-24. Velasco witnessed a younger man—not Ross—get into the car, drive into the interior of the Ingersoll Houses, and park the car in the vicinity of 330 Hudson Walk, a building within the Ingersoll Houses.[2] Tr. 56-58, 25-9; 59, 5-10.

The government introduced into evidence video footage from the Ingersoll Houses taken on the morning of Ross's arrest. Government's Exhibit ("Gov't Ex.") 2A. The video first shows the Dodge Caliber parked on an interior street within the Ingersoll Houses. Tr. 19, 16-24. Ross walks to the Dodge Caliber, enters through the passenger side, and rummages through the vehicle. Tr. 20-21, 9-17. At this point, Velasco and Rodriguez were in their unmarked vehicle on an exterior street of the Ingersoll Houses and did not observe Ross personally. Tr. 21, 18-25. However, Velasco received a radio transmission from Detective Messina at around 10:30 a.m. stating that he saw an individual approach the Dodge Caliber. Tr. 72, 3-13. Velasco drove into the interior of the Ingersoll Houses. Tr. 73, 4-7.

---

[2] Velasco also testified that at some point after the young man drove the Dodge Caliber into the interior of the Ingersoll Houses, but before Ross was arrested, law enforcement stopped another man matching Ross's description. Tr. 61-62, 24-2; 64, 8-15. Shortly after this person was stopped, Velasco received a radio transmission reporting that the individual stopped was not Ross. Tr. 67, 17-20.

The video footage then shows Velasco's vehicle drive from the exterior street onto an interior street inside the Ingersoll Houses. Tr. 22, 5-13. Ross removes sneakers and items of clothing from the Dodge Caliber, closes the door, and walks away. Tr. 22, 16-19; 74, 19-23. Velasco drives closer to where Ross is walking. Tr. 23, 9-10.

The following events were not captured on the surveillance video introduced at the hearing. Tr. 75, 15-19. Velasco testified that he and Rodriguez exited their vehicle and began walking towards Ross. Tr. 16, 1-6; 23, 9-17. When the officers were 20 to 30 feet from Ross, Rodriguez said, "Police, stop." Tr. 16, 7-18. Ross did not stop, and instead started running. Id.

What happened next is captured on the video footage of the interior courtyard of the Ingersoll Houses. Gov't Ex. 2B. Ross is seen running into the interior courtyard. Tr. 25, 14-22. Velasco and Rodriguez run after Ross. Tr. 75-76, 25-3. In the courtyard, Ross turns around and shoots at the detectives. Tr. 26, 1-4.

Velasco testified that Rodriguez and other members of law enforcement shot at Ross after Ross fired at them. Tr. 26, 16-23; 88, 12-25. Officers positioned themselves around the courtyard to block Ross's exits. Tr. 77, 5-16; 79, 1-7; 83-84, 6-2. Law enforcement fired towards Ross, from the direction of Myrtle Avenue, and from behind Ross, from the direction of 330 Hudson Walk. Tr. 88, 17-25.

On the video, Ross continues to run away, but is cut off by Detective Herring in an unmarked police vehicle with its lights on. Tr. 27-28, 23-9. Ross faces the vehicle and shoots at it. Tr. 28, 10-14. Ross then falls to the ground. Tr. 28, 19-20. Velasco testified that he heard metal hitting the ground. Tr. 29, 1. Law enforcement recovered a .22 caliber handgun a few feet from where Ross was on the ground. Id. at 2-9; 85, 19-21. Ross was placed under arrest. Tr. 31, 1-3. In addition to the .22 caliber handgun, law enforcement also recovered nine gold-colored

shell casings removed from the handgun, and 21 .40 caliber shell casings from law

enforcement's firearms. Tr. 85-88.

II.     *Ross's post-arrest interrogation*

FBI Special Agent Arthur Sacco was assigned to the Westchester Safe Streets Task

Force. Tr. 99, 7-11. Sacco testified that he was called into work on October 17, 2021 to be a

liaison between the NRPD, the FBI, and NYPD and to provide surveillance assistance. Tr. 100,

2-13. He arrived at the Ingersoll Houses after Ross's arrest. Tr. 124, 2-7.

At 2:30 p.m., Sacco took Ross from the 88th Precinct of the NYPD, where Ross was first

taken after his arrest, to an FBI building for an "interview."[3] Tr. 126, 8-21. The interrogation

began at around 3:30 p.m. and lasted approximately two and a half hours, including a 20-minute

break during which Ross was allowed to call his girlfriend. Tr. 102, 4-8; 117, 22-24; 118, 2-9.

Sacco interrogated Ross with NRPD Detective Ladeairous and FBI Officer Messina, who were

both also present at the arrest. Tr. 102, 11-14; 128, 5-9. The door to the interrogation room

remained open for most of the interrogation. Tr. 105, 3-4. None of the officers were armed. Tr.

105, 10-14. Ross was handcuffed. Tr. 105, 15-17. At several points in the interrogation, Ross

spoke softly and closed his eyes. Tr. 130, 8-10; 134, 13-14. However, Sacco testified that Ross

did not appear to be under the influence of drugs or alcohol or otherwise in an altered state of

mind. Tr. 113-114, 19-10.

The interrogation was recorded by audio and video. Tr. 102, 18-21. The recording and

video were introduced into evidence. Gov't Ex. 10A. At the start of the interrogation, Detective

Ladeairous read an advice of rights form to Ross and provided him a copy. Tr. 105-106, 21-1.

While reading the form, Detective Ladeairous told Ross that if he decided to answer questions

---

[3] The Court declines to adopt the government's euphemism for Ross's custodial interrogation.

without a lawyer present, he had the right to stop answering at any time. Tr. 135, 1-8. Sacco repeated this warning. Id. While Detective Ladeairous read Ross his *Miranda* rights, Ross laid back in his chair with his eyes closed. Tr. 131, 6-13. Ross opened his eyes and stated that he was "already questioned" on the scene of his arrest and that no one read him his rights. Id. at 14-16; 111, 9-11. Sacco testified that to his knowledge, no law enforcement officer questioned defendant at the arrest. Tr. 111, 12-14. Velasco also testified that he did not question Ross at the scene of the arrest or see anyone else do so. Tr. 31, 9-12. After Detective Ladeairous finished reading the advice of rights form, he asked Ross to sign the waiver. Ross nodded and signed the form. Tr. 108, 4-7; 131-132, 24-14; Gov't Ex. 9. Ross did not ask for a lawyer at any point during the interrogation. Tr. 112, 4-9.

The government presented three excerpts from the interrogation. First, approximately nine minutes into the interrogation, Ross stated, "I don't want to talk and get myself into more trouble, man." Tr. 118-119, 17-6; Gov't. Ex. 10A at 9:00. After this statement, without prompting, Ross continued to speak, adding: "But I got a lot of stuff going on. I don't know what the fuck is going on. My whole life is fucked up." Gov't Ex. 10A at 9:08.

Second, approximately 48 minutes into the interrogation, Ross stated that he could not talk anymore, but that he would continue to talk after he spoke with his girlfriend. Tr. 119, 13-21; Gov't Ex. 10A at 48:35. Sacco testified that he did not end the interrogation at this point because Ross said "he would talk to us if he talked to his girlfriend first," and Ross continued to talk with them, both before and after he spoke with his girlfriend. Tr. 120, 1-6.

Third, approximately two hours and 20 minutes into the interrogation, Ross stated that he did not want to talk to the officers anymore, and the interrogation ended. Tr. 120-121, 15-1.

On cross-examination, defendant replayed the first excerpt—in which Ross stated, "I don't want to talk and get myself into more trouble, man"—to establish that Sacco told Ross he

would not get himself in any more trouble if he kept talking. Tr. 138, 14-20. Defendant then presented three additional excerpts. 16 minutes into the interrogation, Ross said "I can't talk anymore, I can't talk anymore." Tr. 139, 6-11. Sacco's partner asked, "Why not? Is it that much of a burden that you don't want to talk about it? I bet you would feel a little bit better if you spoke about it." Tr. 139-140, 12-4. One hour and 20 minutes into the interrogation, Ross said "I can't, I can't, I can't do it, I've got to lay down," cried, and laid his head on the desk. Tr. 140-141, 21-3. Detective Ladeairous hit the desk.[4] Tr. 141, 4-7. Finally, one hour and 25 minutes into the interrogation, Ross said, "I can't say anything else to you. I respect you, please respect me. I can't talk to you anymore." Tr. 141, 18-22. An officer said, "You can talk to me just like you're doing now," and Ross resumed talking. Tr. 141-142, 23-6. A minute later, Ross said that he had to go and that he couldn't talk anymore, and stood up to leave. Tr. 142, 9-13. An officer told him to sit back down. Id. at 14-16. The officers kept talking to him, and Ross continued to answer their questions. Id. at 17-23. Sacco testified that he did not end the interrogation at this point because Ross continued to answer their questions. Tr. 144, 9-16.

The parties did not play the video of the end of the interrogation. However, the Court reviewed the video and two hours and 20 minutes into the interrogation, Ross stated: "Can I leave please? Can I leave? Can we end this interview please? Can we end this interview please." Gov't Ex. 10A at 2:19. An officer asked, "Why" and encouraged Ross not to "run from it." Id. Ross responded, "I don't want to talk anymore. I don't want to talk anymore. I'm tired and I'm hungry and I'm getting confused." Id. The officers encouraged Ross to continue speaking, with comments such as "we can tell this is weighing heavy on you" and "this is your chance." Id. Ross stated, "I don't want to talk anymore, please." Id. Sacco testified that the interrogation

---

[4] While Sacco testified that Detective Ladeairous "hit" the desk, the video shows Detective Ladeairous tap the desk near where Ross's head rested on his hand.

ended at this point because, "unlike previous times when he continued to talk or offer a caveat . . . . [h]e was very clear" and repeated that he didn't want to talk anymore. Tr. 121, 7-16.

## DISCUSSION

Defendant moves to suppress the firearm recovered at the scene of his arrest, as well as statements he made during his post-arrest interrogation.[5] Defendant argues that the firearm should be suppressed as the fruit of an unconstitutional seizure, because law enforcement lacked reasonable suspicion to pursue and seize Ross, and that his post-arrest statements were obtained in violation of his Fifth Amendment right to remain silent.

I.    *Firearm*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. As a threshold issue, "the first step in any Fourth Amendment claim . . . is to determine whether there has been a constitutionally cognizable seizure." Medeiros v. O'Connell, 150 F.3d 164, 167 (2d Cir. 1998). A person is seized as contemplated by the Fourth Amendment "only when, by means of physical force or a show of authority, his freedom of movement is restrained." United States v. Mendenhall, 446 U.S. 544, 553 (1980).

There is no doubt that Ross was seized when he was arrested. See Torres v. Madrid, 141 S. Ct. 989, 996 (2021) ("[T]he arrest of a person is quintessentially a seizure.") (quoting Payton v. New York, 445 U.S. 573, 585 (1980)). However, the government argues that because Ross threw the gun to the ground while he was being pursued but before he was arrested, it was not the fruit of a stop or seizure. ECF No. 38 at 7. The government relies primarily on the Supreme

---

[5] Defendant initially sought to exclude post-arrest statements he made to a United States Marshal. However, the government no longer intends to introduce those statements at trial and withdrew its notice of those statements at the evidentiary hearing. Tr. 150, 1-11.

Court's holding in California v. Hodari D. that a seizure occurs either (1) when the police use physical force to subdue an individual, or (2) when an individual submits to an assertion of police authority, absent physical force. California v. Hodari D., 499 U.S. 621 (1991). The government contends that the officers "did not display a weapon or use physical force to subdue" Ross, and Ross did not submit to an assertion of police authority because he ran from and shot at the officers. ECF No. 38 at 8.

The government's argument is unpersuasive in this context. None of the cases the government cites involve the pursuit of a defendant with gunfire. See Hodari D., 499 U.S. 621 (foot chase ending in tackle); United States v. Huertas, 864 F.3d 214 (2d Cir. 2017) (defendant ran from officers); United States v. Cuthbert, 466 F. App'x 46 (2d Cir. 2012) (foot chase ending when defendant was pulled off fence); United States v. Swindle, 407 F.3d 562, 572–73 (2d Cir. 2005) (defendant drove away after being ordered to stop); United States v. Jackson, No. 19-CR-356, 2020 WL 1821333, at *2 (E.D.N.Y. April 10, 2020) (foot chase). This distinction is important; when police shoot with intent to restrain a person, it is a seizure. See Torres, 141 S. Ct. at 999 ("[T]he conduct of the officers—ordering Torres to stop and then shooting to restrain her movement—satisfies the objective test for a seizure, regardless whether Torres comprehended the governmental character of their actions.").

Velasco did not testify whether Ross was shot in the exchange of gunfire. If the officers' bullets struck Ross, then Ross was seized by physical force. See Torres, 141 S. Ct. at 998 ("The required 'corporal seising or touching the defendant's body' . . . can be as readily accomplished by a bullet as by the end of a finger.") (citing 3 W. Blackstone, Commentaries on the Laws of England 288 (1768)). However, even if their bullets missed Ross, the officers' conduct— shooting at Ross from multiple directions to prevent him from escaping and blocking his exit from the courtyard—constitutes a seizure by acquisition of control. "Unlike a seizure by force, a

seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement." Torres, 141 S. Ct. at 1001. The Court considers "the overall coercive effect of police conduct," including factors such as "the threatening presence of several officers" and "the display of a weapon." United States v. Almonte-Polanco, No. 20-CR-4126, 2023 WL 4246105, at *2 (2d Cir. June 29, 2023) (quoting United States v. Lee, 916 F.2d 814, 819 (2d Cir. 1990)).

Here, Velasco testified that Ross began shooting[6] towards him and Rodriguez as they chased him into the interior courtyard of the housing project. Tr. 26, 1-4. Other officers arrived during the gunfire exchange, positioned themselves around the courtyard to block Ross's exits, and entered the courtyard to help arrest him. Tr. 77, 5-16; 79, 1-7; 83-84, 6-2. A number of these officers fired their weapons, both towards Ross and from behind him. Tr. 88, 17-25. Ross continued to run, but was cut off by Detective Herring in a police vehicle. Tr. 27-28, 23-9. Ross faced Herring's vehicle and shot at it. Tr. 28, 10-14. Ross then fell to the ground, and Velasco testified he heard metal hitting the ground. Tr. 28-29, 19-1. As such, the officers' show of authority effectively terminated Ross's movement. Thus, Ross was seized by law enforcement at the time he discarded the firearm.

However, "[t]he Fourth Amendment does not forbid all or even most seizures—only unreasonable ones." Torres, 141 S. Ct. at 1003. As such, "'the ultimate measure' of the constitutionality of a government search or seizure is 'reasonableness.'" United States v. Bailey, 743 F.3d 322, 331 (2d Cir. 2014) (quoting Vernonia School Dist. 47J v. Acton, 515 U.S. 646,

---

[6] Ross alleges in his declaration in support of his motion to suppress that law enforcement fired at him first. ECF No. 10 at 11. At the hearing, Velasco testified that Ross shot first. The Court credits Velasco's testimony. However, whether the officers' shooting was justified goes to the question of whether their actions were reasonable—not whether they constitute a seizure. Loria v. Town of Irondequoit, 775 F. Supp. 599, 604 (W.D.N.Y. 1990) ("For Fourth Amendment purposes, [the officer's] motive for drawing and firing the weapon . . . goes directly to the 'reasonableness' of his actions and not to whether there was a 'seizure' in the first instance.")

652 (1995)). Generally, a warrantless arrest is reasonable under the Fourth Amendment when there is probable cause to believe that a crime has been or is being committed. See Herring v. United States, 555 U.S. 135, 136 (2009). "Probable cause exists when, based on the totality of circumstances, the officer has 'knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'" Finigan v. Marshall, 574 F.3d 57, 62 (2d Cir. 2009) (quoting Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007)). The Fourth Amendment also extends to investigatory stops, which are constitutional so long as the officer has reasonable suspicion to believe that a crime has occurred. United States v. Arvizu, 534 U.S. 266, 273 (2002). Reasonable suspicion is a lower threshold than probable cause and requires an officer to have a "particularized and objective basis" to suspect that a person is, or is about to be, engaged in criminal activity, based on the totality of the circumstances. Id.; see also United States v. Lucky, 569 F.3d 101, 106 (2d Cir. 2009).

The Court finds that both standards are satisfied here. Law enforcement had ample reasonable suspicion to stop Ross, and probable cause to arrest him after he shot at them.

Velasco's testimony establishes that he possessed more than the "minimal level of objective justification for making a stop." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting INS v. Delgado, 466 U.S. 210, 217 (1984)). Velasco credibly testified that Ross was a suspect in a New Rochelle homicide committed with a firearm three days before his arrest. Tr. 5, 23-25; 6, 10-16; 8, 1-2; 41, 15-17; 61, 8-10. Velasco reviewed surveillance video that captured Ross getting into the Dodge Caliber before and after the homicide, and that car was registered to Ross. Tr. 7, 5-25; 12-13, 19-2. Velasco was aware that Ross had arrest warrants from Connecticut and Virginia. Tr. 46, 2-9. Velasco reviewed surveillance video that showed the Dodge Caliber pulling into the Ingersoll Houses and Ross entering a building shortly after the

homicide. Tr. 9-10, 19-1. Velasco arrived at the Ingersoll Houses on the morning of October 17, 2021 and saw the Dodge Caliber parked on the outskirts of the Ingersoll Houses. Tr. 10, 2-10. Velasco received a radio transmission from Detective Messina indicating that he saw an individual approach the Dodge Caliber. Tr. 72, 3-13. Velasco drove towards where the Dodge Caliber was parked and saw Ross at the vehicle. Tr. 14, 9-12. Thus, Velasco had a reasonable and articulable suspicion to stop Ross when he saw Ross at the vehicle identified near the scene of a homicide three days earlier. See United States v. Lucky, 569 F.3d 101, 106 (2d Cir. 2009) ("When police stopped Defendant's car, they certainly had reasonable suspicion in light of the fact that the automobile had the same license plate number and description as one used to flee from a shooting two days earlier.").

Defendant proffers several unconvincing reasons why the government fails to establish reasonable suspicion. Defendant argues that the justification for approaching Ross was "conclusory" because the government did not present the New Rochelle surveillance footage at the evidentiary hearing. ECF No. 37 at 8. Defendant contends that this omission deprived the Court of "the best available evidence on which to test its assertion that [Ross] was their suspect," citing to United States v. Garcia, 554 F. Supp. 3d 421, 432 (E.D.N.Y. 2021), appeal withdrawn, 21-CR-2153, 2021 WL 7367169 (2d Cir. Dec. 7, 2021). ECF No. 37 at 8-9. However, in Garcia, a uniformed police officer failed to operate his body worn camera in violation of city policy before entering an apartment without a warrant. As the officer's reasons for failing to activate the camera undermined his credibility, the Court held the government failed to meet its burden of proof to justify the warrantless entry. Id.

Here, however, Velasco credibly testified that he reviewed the surveillance video regarding Ross from New Rochelle prior to Ross's arrest, and that this video provided reasonable suspicion that Ross had committed a crime. Defendant does not argue that the New Rochelle

surveillance video was not presented at the hearing due to some improper act by law enforcement. Garcia does not stand for the proposition, as defendant suggests, that the government was required to present the New Rochelle surveillance video for the Court's review in order to meet its burden. On a motion to suppress evidence, the government's burden is to prove by a preponderance of the evidence that its officers' actions were legal. United States v. Vasquez, 864 F. Supp. 2d 221, 237 (E.D.N.Y. 2012). Whether that burden is met turns on "whether the trier of fact has been persuaded, even if only by the tiniest margin, that the requisite facts have been established." Id. (quoting United States v. Irving, 09–CR–570, 2009 WL 4280287 at *2 (E.D.N.Y. Nov. 25, 2009)).

Moreover, when determining whether an officer had reasonable suspicion to make a stop, the Court considers the totality of the circumstances to see whether the officer had a "'particularized and objective basis' for suspecting legal wrongdoing." Arvizu, 534 U.S. 266 at 273 (quoting United States v. Cortez, 449 U.S. 411, 417-418 (1981)). As such, defendant's assertion that Velasco lacked reasonable suspicion because the government did not present "a description of the suspect, physical evidence, a wanted poster, lineup or photographic array identifications, or any witness with knowledge of why Ross had been deemed the suspect" is also unavailing.[7] ECF No. 37 at 9.

Defendant characterizes the sum of the government's evidence as Ross being "merely present before and after a homicide," which does not rise to the level of reasonable suspicion. ECF No. 37 at 9. Defendant cites to Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560 (1971) for support. In Whiteley, the Supreme Court held that arresting officers lacked probable

---

[7] Defendant also posits that the NRPD's stop of another man matching Ross's description before stopping Ross is further evidence of the officers' lack of reasonable suspicion. ECF No. 37 at 9. Defendant presents no legal support for this argument, and the Court finds it unpersuasive.

cause to arrest based solely on a police radio bulletin that announced an arrest warrant, where the underlying arrest warrant was based solely on an uncorroborated tip from an informant. However, Velasco's reasonable suspicion regarding Ross was not premised on an uncorroborated tip from an informant.

Defendant also argues that Ross's outstanding arrest warrants from Connecticut and Virginia cannot factor into the Court's determination of reasonable suspicion, because such an analysis is limited to the facts known to the officer at the time of the stop, and Velasco "confirmed that he had never seen or possessed these warrants, and only became aware of the apparent inclusion of one of them on a National Crime Information Center ('NCIC') report after Ross's arrest." ECF No. 37 at 9. To defendant, the fact that Velasco's supervisor told him about these warrants does not "amount to any suspicion at all." ECF No. 37 at 10. But Velasco need not have had firsthand knowledge of the NCIC report or Ross's out-of-state warrants.

Under the collective knowledge doctrine, "an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." United States v. Esters, No. 21-CR-398, 2022 WL 16715891, at *6 (E.D.N.Y. Nov. 4, 2022) (quoting United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001)). When imputing knowledge to another officer, the Court looks to whether the law enforcement officer initiating the arrest—in this case, Detective Adrien—had information that would provide reasonable suspicion or probable cause. Id. An NCIC report containing an arrest warrant can establish probable cause for an arrest. See United States v. Towne, 870 F.2d 880, 885 (2d Cir. 1989) (holding that it was "objectively reasonable" for a Vermont officer to rely on a New Hampshire warrant that came up in an NCIC check); Klein v. Glick, No. 19-CV-1056, 2020 WL 5097444, at *5 (D. Conn. Aug. 28, 2020)

(holding that Connecticut police officers had probable cause to arrest plaintiff based on an NCIC printout that showed an extraditable arrest warrant for him); Sanchez v. Port Auth. of New York & New Jersey, No. 08-CV-1028, 2012 WL 1068078, at *6 (E.D.N.Y. Mar. 29, 2012) ("NCIC reports are typically considered reliable and information on them has often been accepted as reasonable basis to form probable cause for an arrest."); Vasquez v. McPherson, 285 F. Supp. 2d 334, 341 (S.D.N.Y. 2003) (collecting cases).

The Court credits Velasco's testimony and finds that he had a reasonable, articulable suspicion to stop Ross as he walked away from the Dodge Caliber.

Velasco testified that when he and Rodriguez approached Ross and Rodriguez ordered Ross to stop, Ross started to run. Tr. 16, 7-18. As the officers pursued him, Ross turned and shot at the officers. Tr. 26, 1-4. This certainly establishes probable cause for defendant's arrest. Even where an initial stop is unconstitutional, a defendant's subsequent unlawful conduct—such as brandishing a weapon or shooting at police—can establish probable cause. See United States v. Bellamy, 592 F. Supp. 2d 308, 322 (E.D.N.Y. 2009). Under these circumstances, courts have refused to suppress evidence discovered after the defendant's unlawful act. Id. (collecting cases). Here, the police had reasonable suspicion for Ross's initial stop, and Ross responded by running and shooting at the officers. As such, law enforcement had probable cause to arrest him. See, e.g., Husbands ex rel. Forde v. City of New York, 335 F. App'x 124, 127 (2d Cir. 2009) (holding that where officer heard shots and saw defendant standing alone in the direction from which the shots were fired, officer had probable cause to believe that defendant had fired the shots).

Ross's arrest was supported by probable cause, and defendant's motion to suppress the firearm recovered at the scene of his arrest should be denied.

## II.    Post-arrest statements

Defendant argues that he unequivocally invoked his right to stop talking during his interrogation, but law enforcement did not honor his Fifth Amendment right. ECF No. 37 at 7. The Court disagrees.

### a.  Voluntariness

As an initial matter, defendant contends that the government did not meet its burden of proving Ross's statements were voluntary. ECF No. 37 at 12. Defendant posits that he told officers he was tired, hungry, and confused, and at several points in the interrogation, laid back in his chair, "eyes closed, unless and until he is alerted by an officer who is repeating himself or banging on a table." [8] Id.

However, the evidence presented does not establish that Ross's *Miranda* waiver was involuntary, or that his subsequent statements were made involuntarily. "In general, a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived *Miranda* rights." United States v. Taylor, 745 F.3d 15, 23 (2d Cir. 2014). Before the interrogation began, Detective Ladeairous read an "advice of rights" form out loud to Ross. Tr. 105-106, 21-1. Ross nodded and signed the form. Tr. 108, 4-7; 131-132, 24-14; Gov't Ex. 9. Ross does not allege that he was threatened or pressured into signing the waiver form, or that he failed to understand the rights that he was read. Sacco testified that Ross did not appear to be under the influence of drugs or alcohol or otherwise in an altered state of mind. Tr.

---

[8] Defendant also emphasizes that his "first words to the interrogating officer were that he had already been questioned at the scene, absent *Miranda* warnings," suggesting that officers engaged in a two-step interrogation technique. ECF No. 37 at 12. Generally, the government has the burden of disproving the deliberate use of a two-step interrogation technique by a preponderance of the evidence. United States v. Capers, 627 F.3d 470, 477-80 (2d Cir. 2010). However, aside from Ross's statement during his interrogation, there is no evidence that law enforcement questioned Ross at the scene of his arrest or otherwise interrogated Ross before he was read his *Miranda* rights. Both Velasco and Sacco testified that to their knowledge, Ross was not questioned at the arrest scene. Tr. 31, 9-12; 111, 12-14.

113-114, 19-10. As such, the Court finds that Ross knowingly and voluntarily waived his *Miranda* rights before speaking with law enforcement.

In order to establish that a defendant's statements were made involuntarily, a defendant's will must have been overborne by law enforcement given the totality of the circumstances, including "the accused's characteristics, the conditions of the interrogation, and the conduct of law enforcement officials." Taylor, 745 F.3d at 23-24 (quoting United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991)). A statement is not voluntary when a person is "unconscious or drugged or otherwise lacks capacity for conscious choice." Id. In Taylor, the defendant swallowed pills in an attempted suicide shortly before being arrested and was in a "trance or a stupor" during the interrogation, when he was not actually asleep. Id. at 25. Here, Ross told the officers that he was hungry and tired, and at times he closed his eyes or laid his head on the table. However, Ross was not asleep and he appeared lucid and coherent throughout the interrogation. As such, there is no evidence that Ross lost his capacity for conscious choice during the interrogation. Cf. Mincey v. Arizona, 437 U.S. 385, 401 (1978) (finding that hospitalized defendant's statements were involuntary because they resulted from "virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness"). There is likewise no evidence that Ross's statements were coerced. See Berghuis v. Thompkins, 560 U.S. 370, 386-387 (2010) (finding no evidence of coercion where three-hour interrogation was held in a standard-sized room in the middle of the afternoon and defendant did not claim police threatened or injured him). As such, the Court finds that Ross's *Miranda* waiver and his subsequent statements during the interrogation were voluntary.

     *b.  Right to remain silent*

Once *Miranda* warnings have been issued, a defendant must specifically state that he wishes to remain silent in order to invoke that right. While there are no "talismanic phrases" or

"special combination[s] of words" needed to invoke the Fifth Amendment right to remain silent, the invocation must be unequivocal and unambiguous. United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996). A simple, unambiguous statement that the defendant "want[s] to remain silent or that he [does] not want to talk with the police" effectively invokes the "right to cut off questioning." Berghuis, 560 U.S. at 382 (quoting Michigan v. Mosley, 423 U.S. 96, 103 (1975)). "Where a required *Miranda* warning has been given," a defendant's incriminating statement "is suppressed to protect the Fifth Amendment right of silence only if a reasonable officer should have been certain that the suspect expressed the unequivocal election of the right." Texas v. Cobb, 532 U.S. 162, 176 (2001) (Kennedy, J., concurring). The Court examines the entire context of a statement "to determine if the right to remain silent has been invoked." Bradley v. Meachum, 918 F.2d 338, 342 (2d Cir. 1990). If a defendant's statements are equivocal, "the officers are permitted to ask narrow questions only for the purpose of clarifying the ambiguity." Ramirez, 79 F.3d at 304. "Ambiguity means 'admitting more than one interpretation or reference' or 'having a double meaning or reference.'" United States v. Coronado, No. 12-CR-83S, 2017 WL 2930573, at *17 (W.D.N.Y. July 10, 2017) (quoting United States v. Mahon, No. 09-CR-712, 2010 WL 3954506, at *2 (D. Ariz. Sept. 29, 2010)).

There is only one point in the interrogation where law enforcement continued questioning Ross after he stated that he did not want to talk to them: approximately nine minutes in, when Ross stated, "I don't want to talk and get myself into more trouble, man." Tr. 118-119, 17-6; Gov't Ex. 10A at 9:00. This statement alone may have unambiguously invoked defendant's right to remain silent. However, Ross did not stop speaking; before the officers interjected, Ross continued to speak, saying, "But I got a lot of stuff going on. I don't know what the fuck is going on. My whole life is fucked up." Gov't Ex. 10A at 9:08. Ross's subsequent statements turned what may have been an unequivocal statement into an ambiguous one. See United States v.

Adams, 820 F.3d 317, 323 (8th Cir. 2016) (finding that defendant's statement "I don't want to talk, man," followed by phrase "I mean I," "signaled that [he] intended to clarify the statement" and statement was "therefore ambiguous"); United States v. Disla Ramos, No. 22-CR-431, 2022 WL 17830637, at *24 (S.D.N.Y. Dec. 21, 2022) (finding statement that defendant did not want to talk "conditional, qualified, and equivocal" where defendant immediately stated that he did not know what was going on in the interrogation).

At no other point in the interrogation did Ross unequivocally state that he did not want to talk or that he wanted to remain silent, until two hours and 20 minutes into the interrogation, at which point the interrogation ended.

At certain other times during the interrogation, Ross stated that he "cannot" talk to the officers. However, in light of the context of these statements, the Court finds that they did not amount to unambiguous and unequivocal invocations of his right to cut off questioning. First, 16 minutes into the interrogation, Ross stated, "I can't talk anymore, I can't talk anymore." Gov't Ex. 10A at 16:00. "I can't" is not synonymous with "I don't want to." A reasonable officer could interpret Ross's statement as an expression of reticence or internal struggle. See, e.g., Coronado, 2017 WL 2930573, at *17 (finding statements including "I can't, I can't, I can't" to fall short of a direct invocation of the right to remain silent).[9] Detective Ladeairous responded: "Why not? Is it that much of a burden that you don't want to talk about it? I bet you would feel a little bit better if you spoke about it." Tr. 139-140, 12-4; Gov't Ex. 10A at 16:20. In response, Ross

---

[9] Various state courts have found that a defendant's "I can't" statement is an expression of an emotional state, rather than a desire to remain silent. See, e.g., State v. Clifton, 892 N.W.2d 112, 161-162 (Neb. 2017) (finding that defendant's statement "I can't" was not "an unambiguous invocation of the right to remain silent," because it indicated "a temporary physical or emotional incapacity, or a fear of reprisal"); Weaver v. State, 705 S.E.2d 627, 631 (Ga. 2011) (reasoning that "I can't talk right now" meant that defendant's emotions had impacted his ability to speak); State v. Lockhart, 830 A.2d 433, 443 (Me. 2003) (defendant's statements "I can't do this," "don't ask," and "I want to go to sleep," in context "are reasonably understood to express [his] internal conflict and pain in being asked to recount what had happened").

offered a *quid pro quo*: he would talk to the officers if they let him call his girlfriend. Id.; see also Disla Ramos, 2022 WL 17830637, at *24 (characterizing defendant's refusal to speak until he knew the context of the interrogation as a *quid pro quo* indicating that "he might be willing to speak if he was given information"). Once the officers told Ross they would let him call his girlfriend, Ross continued to respond to their questions. Id.

48 minutes into the interrogation, Ross stated "I can't talk anymore, I'm done. I need to talk to my girl before I talk to you anymore." Gov't Ex. 10A at 48:40. This statement again offered a *quid pro quo*, rather than a clear statement that he wished to remain silent. The officers arranged for Ross to speak with his girlfriend, and he continued to answer their questions after the phone call. Tr. 118, 1-12.

In the second half of the interrogation, Ross asked to lay down. See Gov't Ex. 10A at 1:20 ("I got to lay down. I got to talk to you later. I probably should . . . just let me lay down. I'll come back and talk to you."); Id. at 2:08 ("I need to lay down. Can I lay down? Can we pick this back up? I haven't eaten."). Ross also stated that he "can't" talk, but continued to speak without being prompted. Gov't Ex. 10A at 1:20 ("I can't do it. I got to lay down. I can't" and, after a few moments, "I'm going to lose my family . . . I'm never going to see my family again."). At other times, Ross said "I can't" but then responded to the officers' questions. Gov't Ex. 10A at 1:26 (Ross stating, "I can't say anything else to you, I respect you, please respect me, I can't talk to you anymore," an officer responds, "You can talk to me, you can talk to me just like you're doing now," and Ross resumes); Gov't Ex. 10A at 1:26 (Ross stating, "I have to go, I can't talk to you anymore, I can't talk anymore" and standing to leave the room, officers tell him to take a breath and sit down, Ross sits down and answers their questions).

Ross's statements fall short of invoking his right to remain silent. Ross became visibly upset when discussing the homicide victim, and thus his statements about his capacity to speak

could be reasonably understood as an expression of his emotional state. Most importantly, Ross continued to speak with the officers. See United States v. Wilson, 567 F. Supp. 3d 398, 405 (W.D.N.Y 2021) (finding defendant's statements equivocal where he stated he had nothing to say and asked to lay down, but continued to converse with officer); Coronado, 2017 WL 2930573, at *17 ("Coronado's statements that he might get killed for talking and that 'I can't say anything' might have sufficed as invocations of his *Miranda* rights had he said those things and nothing else . . . . Again, though, Coronado demonstrated that he was selective in his unwillingness to talk.").

Defendant cites case law that does not change the Court's analysis. Ross did not choose to remain entirely silent, as did the defendant in United States v. Montana, 958 F.2d 516 (2d Cir. 1992). Ross did not answer "No" to the officers' question of whether he wished to speak with them, as did the defendant in Anderson v. Smith, 751 F.2d 96 (2d Cir. 1984). And unlike the defendant in Campaneria v. Reid, 891 F.2d 1014 (2d Cir. 1989)—who, while hospitalized in an ICU unit, stated "No, I don't want to talk to you now, maybe come back later"—Ross did not clearly state that he did not want to talk to the officers. Ross's most direct statement—"I don't want to talk and get myself into more trouble, man"—was equivocal because Ross immediately continued speaking. And while Ross made statements about his inability to speak, he continued to speak. When Ross unequivocally stated that he wanted to stop talking, the interrogation ended. Under these circumstances, Ross's motion to suppress his post-arrest statements to law enforcement should be denied.

## CONCLUSION

The Court finds that the government had reasonable suspicion to stop Ross and probable cause to arrest him. The Court also finds that Ross's *Miranda* waiver was voluntary, and that law enforcement did not violate Ross's right to remain silent. Accordingly, it is respectfully

recommended that Ross's motion to suppress both the firearm and his post-arrest statements should be denied.

## FILING OF OBJECTIONS TO REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 59 of the Federal Rules of Criminal Procedure, the parties shall have fourteen days from service of this Report to file written objections. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file objections within the specified time "may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object." United States v. Ballares, 317 F. App'x 36, 38 (2d Cir. 2008) (quoting United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997)).

SO ORDERED.

                                                        /S/

                                              LOIS BLOOM
                                              United States Magistrate Judge

Dated: July 31, 2023
       Brooklyn, New York